20193qrosnbhcf

1   UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
    ------------------------------x
3   UNITED STATES OF AMERICA,

4            v.                              18 MAG 10939(LMS)

5                                           BAIL HEARING

6   JACOB ROSNER,

7            Defendant.
    ------------------------------x

8                                   United States Courthouse
                                    White Plains, New York
9                                   March 26, 2019

10

11

12  Before:   THE HONORABLE LISA MARGARET SMITH, Magistrate Judge

13

14                            APPEARANCES
15

16  GEOFFREY S. BERMAN
        United States Attorney for the
17      Southern District of New York
    JAMIE E. BAGLIEBTER
18  SAMUEL S. ADELSBERG
        Assistant United States Attorneys
19

20

21  SAMUEL BRAVERMAN
        Attorney for Defendant

22

23  Also present:  STEVEN ZAGER, Yidish Interpreter

24

25  *Proceedings recorded via digital recording device.

                    CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                              (914)390-4103

1         THE DEPUTY CLERK:  In the matter of the United States

2    of America v. Jacob Rosner.

3         Counsel, please note your appearance for the record.

4         MS. BAGLIEBTER:  Good afternoon, your Honor.  Jamie

5    Bagliebter for the government, and with me at counsel table is

6    AUSA Sam Adelsberg.

7         THE COURT:  Good afternoon.

8         MR. BRAVERMAN:  Good afternoon, your Honor.  Sam

9    Braverman for Mr. Rosner.  Mr. Rosner is seated immediately to

10   my right.

11        THE COURT:  Good afternoon.

12        THE INTERPRETER:  Steven Zager, New York State

13   Yiddish interpreter.

14        THE COURT:  Good afternoon.  Do I understand that

15   your oath is on file?

16        THE INTERPRETER:  Yes.

17        THE COURT:  Thank you.

18        I take it we are here for a bail hearing with regard

19   to Mr. Rosner.  Is that right?

20        MR. BRAVERMAN:  That is correct, your Honor.

21        THE COURT:  Let me hear from the government first.

22        MS. BAGLIEBTER:  Your Honor, the government's

23   position is that detention should be continued awaiting trial.

24   This is primarily because the defendant is a flight risk, but

25   he is also a risk to the community from a dangerousness

1    perspective.

2              A few points first just to provide some context.

3              The defendant here has been charged with 18 U.S.C.

4    1201, a kidnapping charge, so it's a rebuttable presumption

5    case here.  I'll also note that Probation has recommended

6    detention in this case.

7              Another point of context is that, in the Lev Tahor

8    community, the defendant, who's 20 years old, is considered to

9    be married to one of the victims in the case, an individual

10   who's 14 years old.  As you'll note in the Pretrial Services

11   report, he's identified himself as single, but has noted that,

12   in a religious context, there was a ceremony in which he was

13   intended to wed or wed the 14-year-old victim.  So that is

14   important context in understanding the defendant's position

15   here.

16             And then, third, I would like to just provide some

17   brief description of his role in the conduct.  As I'm sure

18   defense counsel will emphasize, the defendant here is not a

19   leader of this kidnapping effort, he's a follower, and that

20   presents just as much concern to us.  That presents just as

21   much concern to us because the defendant here is a devout

22   student of the Rabbi in Lev Tahor, whose name is Nachman

23   Helbrans, and is a co-defendant of his on this case, and he is

24   the son of Mayer Rosner, another leader of Lev Tahor and

25   another leader of the kidnapping effort.  And those

1    individuals, as well with the other co-defendants, planned a

2    kidnapping and assigned this defendant roles in that

3    kidnapping, and he took place in the kidnapping because that's

4    what he was asked to do by the leaders of his organization.

5          And he did have a significant role in the kidnapping.

6    He was there before the kidnapping, part of planning

7    conversations, taking actions to buy disguises for the victims

8    to wear so that they would be more difficult for law

9    enforcement to find during the kidnapping, and then he was

10   there after the taking of the children from New York in Mexico

11   with the children.  So he was found by Mexican law enforcement

12   officers in a house in Mexico with several of the other

13   co-defendants.  And we didn't know this at the, time but we

14   later learned that the victims were, in fact, inside of that

15   house with the defendant.

16         So the defendant's role was not minor here.  He was

17   not a leader, but he did participate in the kidnapping, and he

18   did so because that's what he was instructed to do.  And his

19   role was active and his role was knowing.  And even if it was

20   because he was beholden to these other individuals, that

21   creates a real flight risk concern.  So let me turn to the

22   flight risk issues.

23         This is an extreme risk of flight case.  The largest

24   concern is his lack of ties to the United States.  The

25   defendant was born here, lived here for three years, and has

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

since been living in Canada or in Guatemala.  He has no family

here.  He has no occupation here.  He has nowhere to live here.

In fact, in the Pretrial Services interview, he was unable to

provide the address that he would be staying here.  So he

doesn't have any ties to this community in New York.  His

community is in Guatemala.  There are several members of Lev

Tahor in Guatemala.  That's where they are predominantly

located and that's where he has lived the majority of his life,

with respect to Canada, as I mentioned, and a couple months in

Mexico.

        The proposal for him to stay -- my understanding of

the proposal, and I may just -- I'm sure I'll learn more

details as we go, but my understanding of the proposal is for

the defendant to stay with a rabbi who is the Rabbi employed by

Westchester County Jail, who is has been visiting the

defendant.  The defendant doesn't know where this Rabbi lives.

Their relationship is I believe, by definition, fairly new

because he's only been incarcerated for a couple months here.

And the proposal is that he will live there.

        There is really no moral suasion value in living with

this new individual, and that raises enormous concerns about

why he would stay here in New York rather than flee.  As I

mentioned earlier, he's beholden to the leaders of Lev Tahor.

If they tell him to kidnap, he kidnapped.  They tell him to

flee, he's going to flee.  And we don't really have a sense of

1    what would keep him here because he doesn't have his family

2    members here, he doesn't have a life here, his siblings and his

3    mother are in Guatemala, and he sort of would just be here

4    awaiting trial in this very, very unusual circumstance.

5            Another point on the flight risk is really just

6    looking at the kidnapping itself and how it demonstrated how

7    adept these individuals can be at evading law enforcement.  The

8    victims were taken in the middle of the night, I guess the

9    early morning hours on December 8th, and they were not located

10   until December 27th.  The co-defendants -- the defendant and

11   his co-defendants used forms of false identification.  They

12   used numerous cell phones to communicate with each other and

13   messaging apps.  They exchanged money through many different

14   formats to make it more difficult to trace.  As I mentioned

15   earlier, they wore secular clothing to try and disguise

16   themselves, even though that's not their traditional clothing.

17   They planned here routes out of the country very meticulously.

18   They left in different routes out of the country, also making

19   it harder to track.  It was very difficult to locate these

20   defendants when they fled because they worked very hard to

21   evade law enforcement in that setting.  I'll also note we know

22   that at least some of them got over the Mexican border and we

23   have no records of that.  So there is also movement across

24   borders that we can't track.

25           All of those things show that if there's a desire to

1    flee here, they can flee.  This defendant can flee, and he can

2    flee in a way that makes it very, very difficult for us to find

3    him.

4            I would just also note, in terms of considering the

5    flight risk, that Lev Tahor itself is an international

6    organization.  They have operations and allies in Canada, in

7    Israel and some European countries.  Those ties are what is

8    going to be strongest for this defendant.

9            And also on the risk of flight, defendant's facing a

10   very serious sentence.  He's facing a maximum penalty of life.

11   With that kind of sentence potentially facing him, being

12   released to a person's home that he's just met, having been

13   someone who's been on the run from U.S. law enforcement for

14   weeks without being found, there's a real question of why he

15   wouldn't run in this instance, particularly if that's what he

16   was advised to do.

17           Now, lastly, just very briefly, I'll just address

18   dangerousness.  The statute looks at whether there's a danger

19   to the community or a danger to any particular person and,

20   again, this defendant, on his own, in isolation, is not the

21   most dangerous person there is.  We don't have prior acts of

22   violence.  But he did participate in a kidnapping, which is a

23   very dangerous crime.

24           And it's important also to note that there are

25   members of the Lev Tahor community right now who are currently

1    and actively continuing to find and look for ways to take these

2    children back to Guatemala.  And law enforcement has expended

3    credible resources to protect the safety of these children and

4    the safety of this family.  And one of the kidnappers who was

5    part of the scheme to kidnap her is currently seeking to be

6    released out on bail at a time when there are active efforts to

7    kidnap the children once again.  And I'll note that these

8    efforts, we know that they are in part being dictated by the

9    Rabbi Nachman Helbrans, who is incarcerated right now.  He is

10   participating in recorded calls in trying to find ways to get

11   these children back to Guatemala.  And that's happening

12   currently.  And so there is a real risk of dangerousness

13   because if the defendant is out, that's one more individual who

14   is taking the orders and listening to the leaders of this

15   community to cause great risk to this family.

16            Thank you.

17            THE COURT:  Thank you, Ms. Bagliebter.

18            Mr. Braverman.

19            MR. BRAVERMAN:  Thank you, Judge.

20            Well, Judge, some things I would suggest are not in

21   dispute.  It is, I think, not in dispute that, on a particular

22   evening, the two people who are identified as the complainants

23   walked out of a house.  There's apparently videotape showing

24   them walk out of the house.  So the statute identifies this as

25   kidnapping, and I'm sure that Congress meant something to

convey that was really dangerous and important.  Of course,
when we talk about kidnapping, we usually talk about somebody
bonked on the head, duck taped and tossed in the back of a car,
not somebody who flees from someplace to go someplace else.

          The one thing I also want to do is I do not want to
be in any sort of debate with this Court or with the government
or with anybody in the audience as to whether or not a
particular religion is correct or incorrect.  I know that is
not the province of this Court and it's not the province of me
to make that kind of determination.  We're only here to enforce
what the laws are for our society and whether or not this
gentleman can be released under some sort of conditions.

          The government suggests that it is a presumption
case.  With the question of presumption, can I overcome that?
I believe that the answer is yes.

          A court already has ruled on one of the
co-defendants.  Judge Davison ruled several weeks ago that one
of the co-defendants could be released.  The conditions that
were set forth there -- I have a copy of the bail conditions --
they were substantial, they were quite broad, and they are
quite acceptable to us.

          So, for example, in that case, that is a person who
has resources.  You can't really compare the resources of that
individual to my client because my client is close to zero.  So
divide it by zero would not work.  But the resources of that

1    individual are enormous, and that was $10 million bail.

2              What I have here is an individual by the name of Abe

3    Lichtenstein.

4              Please stand up.  Would you please stand up, sir.

5              Mr. Lichtenstein here is a member of the community

6    here, and he has provided to me documents, which were provided

7    to the government I guess about ten days ago; tax returns,

8    property identification.

9              What we're proposing here is a million-dollar bond

10   fully secured by property.  Mr. Lichtenstein has owned this

11   property outright.  He has it.  It is not his only property,

12   but it is property that he has.  And I present him to be

13   available for interview to Pretrial Services and to the

14   government.  They can take all the time they need to discuss

15   his situation and so forth and why he's willing to put forth a

16   significant fully secured bond to bet on this gentleman here,

17   making sure he doesn't go anywhere else.  So in terms of what

18   would be realistically put up, we're realistically willing to

19   put up that.

20             In terms of making sure that Mr. Rosner doesn't go

21   anywhere, as we did with the other Rosner, we're proposing

22   electronic monitoring, strict pretrial supervision, home

23   confinement.  So that would be that the young Mr. Rosner here

24   would have a bracelet on his ankle.  He would not be able to

25   leave the house absent approval by Pretrial Services.  He would

1    not be able to go out on a regular basis.  He would have a set

2    curfew, could not wander around during the day.  Anything that

3    was proposed for Mr. Rosner we accept completely.

4              The place where he would stay is with Rabbi Horowitz.

5              Rabbi Horowitz, please stand up.

6              This gentleman here is Rabbi Horowitz.  Rabbi

7    Horowitz, as the government correctly points out -- thank you,

8    sir -- met my client only several months ago.  So my client was

9    detained on December 28th.  So they've only had a chance to see

10   each other now for just about exactly three months.

11             So why would a person who has only met my client

12   three months ago be willing to stake his entire reputation, his

13   liberty, his assets, why would he be willing to do that for

14   this young man?  That must have been quite the powerful

15   relationship that's developed in three months.  So Rabbi

16   Horowitz has met with my client nearly every single day and,

17   during that time period, they have prayed together, they have

18   talked, they have discussed.  And in that time period, Rabbi

19   Horowitz indicates to me that he's developed an actual

20   friendship and a respect for this young man, so much so that he

21   would be willing to have him in his own home; not because

22   somebody's threatening or forcing him to do it, not because

23   somebody's paying him to do it, not because he owes it to

24   anybody, but because it's a good deed and because he believes,

25   as I asked him again today -- I spoke with him yesterday, spoke

1    with him before.  Whenever I've asked him, I've said will you

2    follow the rules that this Judge sets?  Not your own set of

3    rules.  Not what you like the community's rules to be.  The

4    rules exactly as laid out.  He says I will absolutely follow

5    the rules.  And I said what if Mr. Rosner doesn't follow the

6    rules.  He says I will try and make him follow the rules, and

7    if he doesn't, then I will make sure that Pretrial Services

8    knows.

9         And I've asked Mr. Rosner here what if a rabbi comes

10   to you and says God tells you to do something different from

11   what the Court says.  This is a serious question.  My client

12   said to me he will follow the rules as this Court sets them.

13   It's a punishment of going to jail.  It's a punishment of being

14   arrested and charged with new crimes.  It's a punishment of

15   causing enormous damage to other people who have taken

16   consideration of him.

17        I have no doubt that if my client were to flee, that

18   would affect my client's father's kids and my client's uncles'

19   kids.  And I assure you that if the government believes that my

20   client would follow the instructions of the Rabbi, my client

21   would do nothing to hurt the Rabbi and he would do nothing to

22   hurt his father, and his flight would have a direct consequence

23   of both of their cases.

24        So in terms of moral suasion, we would have in the

25   house in which he lives a rabbi, which is a person of enormous

1   respect in his community.  He would have the moral suasion that

2   he would cause damage to his father and to his uncle and to the

3   rabbi and his community.  So the moral suasion would be direct,

4   it would be immediate and it would be very specific.

5          So the conditions that were set down for Mr. Rosner,

6   Mr. Aron Rosner, were things like he is not to leave the house.

7   And he was given I think a very strict window of about two and

8   a half hours per week that he could do to attend to religious

9   services.  And if this Court found that that was appropriate,

10  we would live by those terms.  Aron Rosner was not to have any

11  contact with members of Lev Tahor.  My client would abide by

12  exactly the same set of rules.  My client would have no

13  internet access.  If it was necessary to have a phone, we could

14  find a phone.  I, many times, have arranged for a client to

15  have a phone with no internet capabilities whatsoever.  We

16  could do that.  The government could keep a pen register on

17  that phone so that any calls that are coming in or going out,

18  the government could know where they're talking to and who is

19  he talking to.

20         The Rabbi has a place of worship in his own home, so

21  the fact is it's even easier.  Services come to him.  And so

22  there would be a place where my client would have a room and he

23  would have a place to live and if there were religious

24  services, they could be done in the home and my client doesn't

25  even have to travel beyond -- literally, anything that Pretrial

1    Services says is not appropriate, we would live by those rules.

2           I have had a chance to speak -- so I understand, in

3    terms of the connection to the community, it appears, Judge,

4    actually, that my client has something approaching 30 aunts and

5    uncles who live in this community here within -- I guess within

6    the Southern District of New York.  That's more than I have,

7    and I've been here for 53 years.  But aunts and uncles.

8           And the people who have come to visit my client --

9    literally every day somebody's coming to visit my client and to

10   provide him with food and to provide him with clothing, and

11   it's not because he's a leader in their community, but because

12   he's a member of their community and they are caring for one of

13   their own.  And so I would think, Judge, that actually provides

14   reasonably good confidence to this Court that these people will

15   make sure that he abides by the rules.  The last thing that

16   they want him to do is to go back to prison.  Because I get a

17   call nearly every day where somebody says they've come to visit

18   my client in prison and he weeps all the time and he's

19   terrified and he's scared to be sitting there.  It's

20   devastating.

21          As the Court well knows, as I well know, as we all

22   know, jail is an awful place.  And so I guess the question I'm

23   proposing to the Court is is that the only possibility.  Can we

24   not create a system, a group of considerations, that will make

25   this Court comfortable that this Jacob Rosner will not reoffend

1    and will attend everything he needs to do, and I think that

2    there are.  And if the Court said I would like more conditions,

3    I will negotiate any conditions the Court is looking for,

4    because I think -- I've been in front of this Court for 15

5    years now.  I know the conditions are going to be reasonable.

6    They're going to be tailored to this situation.  If the Court

7    has more conditions you would like to impose, that's fine with

8    me, too.  Mr. Rosner will follow any conditions the Court

9    imposes.

10           But I absolutely believe -- and then, remarkably,

11   Judge, the community that's been here today, that's all

12   attending here, they would all stand up now.  And if the Court

13   wanted to interview Rabbi Horowitz, I have three witnesses here

14   who have come today just in case the Court wanted to know about

15   Rabbi Horowitz.  Rabbi Bloom is here and he would come -- you

16   could interview him about the quality of Rabbi Horowitz.  And

17   Mr. Lichtenstein, if the Court wanted to interview him, I've

18   got three people here.  You could interview them about him and

19   whether or not he's trustworthy.  So that, at the end of the

20   day, the Court could have the concerns that the Court may have

21   addressed.

22           In terms of the dangerousness to the community,

23   Judge, it's a significant charge.  I don't dispute that.  And I

24   don't dispute that the government says -- if it says it can

25   prove it, as we know, they can't bring a charge that they don't

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

```
 1    believe they could prove.  I do believe that, at the end of the
 2    day, if there was a jury trial, if we convey to the jury the
 3    information that I have received now in three months, this jury
 4    would never convict my client of kidnapping.  If the jury
 5    thought -- if the charge were proposed to them about the
 6    custodial interference charge, which seems to be much closer
 7    matching to the facts of this case -- I have not received
 8    discovery.  There's an enormous amount that I probably don't
 9    know about this case.  In fact, in funny ways, I may be the
10    person that knows the least amount about the case in the room
11    here.  But everything I've learned, custodial interference does
12    seem like the more accurate charge.  That is not a presumption
13    charge.  That is not a mandatory minimum charge.  And that's a
14    big difference from where we are here now.  And so that is
15    still -- this Court is not trying the case.  I'm not asking you
16    to try the case.  But it's something for the Court to consider.
17            And so, for all of those reasons, Judge, and if there
18    are any questions the Court has, I do believe there is a series
19    of conditions that can overcome the presumption, that could
20    allay the Court's concerns, that would give this Court good
21    reason to say that if this gentleman is released, he will be
22    back here on each and every day he is to be back.
23            Unless the Court has any further questions.
24            THE COURT:  Thank you, Mr. Braverman.
25            MR. BRAVERMAN:  Thank you, Judge.
```

1           THE COURT:  Ms. Bagliebter.

2           MS. BAGLIEBTER:  Just a few follow-up points.

3           Before I get to them, I just want to note I agree

4    with Mr. Braverman wholeheartedly and I think it probably

5    doesn't even require saying of either the government or the

6    defense that this is not about whether any particular religion

7    is correct or incorrect.  That is not in any way relevant to

8    our argument here, and I hope it's not construed by the Court

9    or anyone else in that way.

10          Turning to sort of the more substantive pieces of

11   what Mr. Braverman has said, the first thing I just want to

12   address is Judge Davison's decision to let one defendant out on

13   bail.  That did occur.  And Judge Davison was very careful in

14   his ruling.  And he said during that conference, he said this

15   defendant stands in significantly different shoes than the

16   other defendants.  He said he's in stark contrast to the other

17   defendants.  And he said the defendant has strong family and

18   community ties here.

19          And there is an enormous difference between the

20   other -- his co-defendant Aron Rosner and the defendant here.

21   Aron Rosner is an individual who has lived in Brooklyn the

22   majority of his life.  He was not in Guatemala.  He was not in

23   Mexico when the children were found.  He was not an active

24   participant.  And I'm careful here.  He was not -- on the night

25   of the robbery, he did not act in taking the kids.

1          THE COURT:  The kidnapping.

2          MS. BAGLIEBTER:  In the kidnapping.  I'm sorry.  On

3    the night of the kidnapping.  He did not actively go retrieve

4    the kids.  And he didn't evade law enforcement by literally

5    fleeing New York and going to Mexico.  So that's one strong

6    difference in Mr. Rosner's case, in Aron Rosner's case.

7          Aron Rosner also has a very large family here in

8    Brooklyn.  He has a wife.  He has several children, one of

9    which who has a disability that raises a bunch of child-care

10   concerns for him and his wife and their family that I think

11   Judge Davison was rightly taking into account.  And Aron Rosner

12   has a job in life and employment, or some form of employment in

13   Brooklyn.  His life was in Brooklyn.  So that's a more

14   traditional case where we had concerns about his flight risk,

15   we had concerns about his dangerousness, but at least the Court

16   was presented with, hey, this guy's going to go back to his

17   life and where he lives; he's going to be on home detention,

18   but he's going to be living with his family.  And his wife's

19   family put up an enormous amount of property.  So, in Aron

20   Rosner's case, it was a $10 million bond with nine financially

21   responsible cosigners and $6 million secured in property.  The

22   defendant was detained for several weeks while the government

23   waded through the necessary paperwork of the six properties to

24   make sure that everything was up to the required standards and

25   that all of the certificates of judgments were filed.  So the

situation that Aron Rosner was in was very, very different than
the defendant.  As I've already gone through, the defendant
here just doesn't have that level of ties here, or really any
ties.

          So now turning to Mr. Braverman's point about
Mr. Lichtenstein and Rabbi Horowitz.  The question is not
whether it's an extraordinary act of generosity on the part of
Mr. Lichtenstein and Rabbi Horowitz to put their neck out for
the defendant.  There's no question that it is.  This is really
an extraordinary showing from those individuals, and that's
fantastic, but that's not what we're being asked here.  And the
fact that there's many people in the community who will speak
to the great qualities of Mr. Lichtenstein and Rabbi Horowitz
is also fantastic, but the question isn't what they are willing
to do for the defendant.  The question is what does it mean to
the defendant that, if he runs, it will have a negative impact
on them.  And that's why so often we're looking to family
members, to long-standing relationships that the defendant has,
because that's what gives us and, I assume, the Court the
comfort that the defendant will feel that moral-suasion
pressure.  And no matter how fantastic Mr. Lichtenstein and
Rabbi Horowitz are, which they certainly seem to be, that
doesn't change that we really don't have any reason to believe
that the defendant is going to start caring more about what
would happen to them than what would happen to everything that

1    he's cared about in the past, for his entire 20 years of life.

2              And Mr. Braverman says, you know, I spoke to my

3    client and he said he's going to follow the Court's law instead

4    of what a rabbi tells you. Well, you know, these defendants

5    knew what they were doing was wrong when they kidnapped the

6    children. That's clear by all of the ways that they were

7    trying to evade law enforcement. If they didn't think they

8    were breaking the law, there would be no need for the multiple

9    cell phones and multiple forms of money transfers and the

10   disguises and all of that. So they knew what they were doing

11   was wrong, and they were choosing to engage in self-help and

12   they were choosing to do something on their own, even though it

13   was contrary to the law and they knew that. So I just don't

14   think that there's any real way to feel comfortable that he

15   has, all of a sudden, in the three months that he's been

16   detained and in his meetings with Rabbi Horowitz, has changed

17   his tune and is sort of no longer beholden to the forces that

18   he was before.

19             I think that's all, your Honor.

20             THE COURT: Thank you.

21             Mr. Braverman, last word.

22             MR. BRAVERMAN: Nothing in rebuttal, your Honor.

23             THE COURT: All right.

24             MR. BRAVERMAN: I apologize. One second, Judge.

25             THE COURT: Yes.

1      (Pause)

2          MR. BRAVERMAN:  Thank you, your Honor.

3          Judge, just to add one additional fact, it appears

4    that my client's father's parents, so my client's paternal

5    grandparents, are here in the audience, as well, today, and has

6    indicated that, if the Court wished, they would be specifically

7    ones to sign the bond as well.  So we can have this direct

8    lineage on the bond as well.  Thank you

9          THE COURT:  Thank you, Mr. Braverman.

10          This is a highly unusual circumstance, but I do not

11    believe that the circumstance that led to my colleague granting

12    bail to the defendant Aron Rosner is at all similar to the

13    circumstance currently present.

14          As Ms. Bagliebter mentioned, Aron Rosner is a

15    resident of the greater New York community, has a home and

16    family, direct family, including his wife and children, and had

17    a history in the Southern and Eastern Districts of New York.

18    Everything that's been presented tells me that this defendant

19    has no such connection, no such history.  Though he may have

20    relatives -- not immediate family, but more distant,

21    grandparents, aunts and uncles -- he was unable to tell

22    Pretrial Services where he would be able to reside.  And,

23    indeed, of all of those family members, it's not a family

24    member who has offered him a place to reside, but someone he's

25    known for just a few months.  This leads me to conclude that

1    the family ties are less than overwhelming.

2            This is a case in which the defendant is charged with

3    an extremely serious crime.  It's not up to me to decide

4    whether the actions here were intended to be covered by this

5    statute.  It's up to me to decide whether the complaint

6    establishes probable cause to believe that this defendant

7    committed this crime.  I have already made that determination,

8    as did my colleague, Judge Davison, when he signed the original

9    complaint.  Probable cause has been established that this

10   defendant participated in the crime of kidnapping two children;

11   hiding their identities; taking them out of the United States,

12   where their mother had lawful custody of them; hiding them from

13   law enforcement in Mexico; and apparently intending to take

14   them to Guatemala, where the possibility that those children

15   could ever be returned was very small.  This extremely serious

16   offense, which, in my view, is established by the assertions in

17   the complaint, carries with it a rebuttable presumption that

18   there are no conditions or combinations of conditions which can

19   assure both the safety of any other person and the community

20   and the defendant's return to court.

21           Mr. Braverman has put forth a package which, in some

22   circumstances, I would find to be adequate to assure the

23   defendant's return to court, but, in this case, I'm not

24   satisfied that this defendant would have sufficient allegiance

25   to Rabbi Horowitz or to -- I'm sorry, I didn't -- I didn't hear

1    your name correctly.  Mr. --

2                    MR. LICHTENSTEIN:  Lichtenstein.

3                    THE COURT:  -- Lichtenstein or even to his

4    grandparents to assure that he would remain in the community as

5    required and return to court as required.

6                    Moreover, I am satisfied that releasing this

7    defendant would present a risk of danger, specifically to the

8    two victims of this kidnapping, who are still at risk.

9                    So, for all of those reasons, I'm denying the

10   application for bail.  The defendant will remain detained.

11                   Mr. Braverman, you're fully aware of your right to

12   appeal.

13                   MR. BRAVERMAN:  Respectfully, I am, your Honor.

14   Thank you.

15                   THE COURT:  Anything further, Ms. Bagliebter?

16                   MS. BAGLIEBTER:  No, your Honor.

17                   THE COURT:  Mr. Braverman?

18                   MR. BRAVERMAN:  Nothing further.  Thank you, Judge.

19                   THE COURT:  Thank you.  We are adjourned.

20

21                              - - - -

22

23

24

25

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103